**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **MARY ANN WILLIAMS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No.: 5:22-cv-242-CAR** |
| | : | |
| **TIMOTHY WARD, *et al.*,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

After Jousha Williams ("Decedent") was stabbed by one or more inmates in his dorm at Baldwin State Prison ("BSP") and died approximately four and one-half hours later on July 3, 2020, his mother, Plaintiff Mary Ann Williams, as administratrix of Decedent's estate and as next friend of his minor daughter, My'asia Abdulleah, sued eleven prison officials in their official and individual capacities under 42 U.S.C. § 1983, alleging they caused her son's death by failing to protect him from violent inmates and delaying their call to 911 in violation of the Eighth Amendment. She asserts deliberate indifference to serious medical needs claims and failure-to-protect claims.

Currently before the Court is Defendants Timothy C. Ward, the Commissioner of the Georgia Department of Corrections ("GDC") in July of 2020;[1] Ronald Brawner, Warden at BSP in July of 2020;[2] Walter Berry, Warden at BSP starting in December of 2020;[3] Eric Martin, Deputy Warden of Security at BSP;[4] Laurence Easley, a Unit Manager at BSP;[5] Reginald Clark, a Unit Manager at BSP;[6] Darren Troutman, a Lieutenant at BSP;[7] Derrick Trawick, a corrections officer at BSP;[8] Keaysia Thurman, a corrections officer at BSP;[9] Terra Jackson, a corrections officer at BSP;[10] and Rossello Tolentino's, the onsite nurse at BSP,[11] Motion for Summary Judgment. For the reasons explained below, Defendants are entitled to summary judgment on all Plaintiff's claims. Specifically, Plaintiff consents to the dismissal of her official-capacity claims and all her claims against Defendants Berry, Easley, Thurman, and Jackson; Plaintiff abandoned all her failure-to-protect claims against the remaining Defendants; and the remaining Defendants are entitled to summary judgment on Plaintiff's deliberate indifference to serious medical

[1] Ward Dep. at 11, [Doc. 65-9].
[2] Brawner Dep. at 16, [Doc. 65-10].
[3] Berry Dep. at 14, [Doc. 65-11].
[4] Martin Dep. at 14, [Doc. 65-12].
[5] Easley Dep. at 10, 11, 15, [Doc. 65-13].
[6] Clark Dep. at 17, 43-45, [Doc. 65-14].
[7] Troutman Dep. at 9, 11, [Doc. 65-15].
[8] Trawick Dep. at 9, [Doc. 65-17].
[9] Thurman Dep. at 9, [Doc. 65-18].
[10] Jackson Dep. at 9-10, [Doc. 65-19].
[11] Tolentino Dep. at 8, 28, [Doc. 65-20].

needs claims because she fails to present expert testimony necessary to show the element of causation. Thus, the Defendants' Motion [Doc. 65] is **GRANTED**.

## STANDARD

Summary judgment is proper if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[12] The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitles it to a judgment as a matter of law.[13] If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[14]

The Court must view the facts, and any reasonable inferences drawn from those facts, in the light most favorable to the party opposing the motion.[15] "The inferences, however, must be supported by the record, and a genuine dispute of material fact requires more than 'some metaphysical doubt as to the material facts.'"[16] In cases where

[12] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[13] *Catrett*, 477 U.S. at 323 (internal quotation marks omitted).
[14] *See* Fed. R. Civ. P. 56(e); *see also Catrett*, 477 U.S. at 324-26.
[15] *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010); *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).
[16] *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (quoting *Penley*, 605 F.3d at 848).

opposing parties tell different versions of the same events, and one is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."[17] A disputed fact will preclude summary judgment only "if the dispute might affect the outcome of the suit under the governing law."[18] "The court may not resolve any material factual dispute, but must deny the motion and proceed to trial if it finds that such an issue exists."[19] Ultimately, summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[20]

## BACKGROUND

On July 2, 2020, Decedent was housed in Dorm I-1 inside I-Building at Baldwin State Prison (BSP) in Hardwick, Georgia.[21] That evening, Defendant Trawick, a corrections officer, was working the night shift inside I-Building's control booth.[22] The centrally-located control booth overlooked four dorms (or pods) that each housed 24 general population inmates, including Decedent.[23] Decedent's dorm had two levels of

---

[17] *Pourmoghani-Esfahani v. Gee*, 625 F.2d 1313, 1315 (11th Cir. 2010) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).
[18] *Id*. (internal quotation marks omitted).
[19] *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981). In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.
[20] *Celotex*, 477 U.S. at 323.
[21] Case Report, Investigation Overview, at 4, [Doc. 67-5]. Dorm I-1 is also referred to as Dorm I-A. *Id.*
[22] Trawick Dep. at 19:8-25, 20:1-4. Defendant Trawick's shift began at 6:00 p.m. *Id.* at 19:25, 20-1-4.
[23] *Id.* at 12:3-5, 21:4-10, 23:8-21; Clark Dep. at 92-93.

cells and a common area called a day room.[24] A balcony stretched across the upper level of cells,[25] and a hallway connected the dorm's exterior door on the ground floor to the control booth.[26] From the control booth, Defendant Trawick could see "all areas of the dorms" by "checking the cameras" and "look[ing] out the window."[27] Corrections officers can access landline phones in their control booths.[28]

Defendant Trawick testified he was taught as a corrections officer "to call [his] supervisor [on his radio] as quickly as possible" when first responding to an inmate "in need of immediate medical care[.]"[29] Although a written GDC policy authorizes correctional personnel to call 911 directly when responding to a life-threatening emergency,[30] Defendants Commissioner Ward,[31] Warden Brawner,[32] and Deputy Warden of Security Martin[33] testified they implemented an unwritten practice that a corrections

---

[24] Troutman Dep. at 54-56; Clark Dep. at 92-94;

[25] Troutman Dep. at 54-56, 58; Trawick Dep. at 58; Case Report, Investigative Case Summary, dated July 6, 2020, at 103-04, [Doc. 67-5].

[26] Troutman Dep. at 52:18-21, 53:1:25, 58:1-25.

[27] Trawick Dep. at 23:8-21, 24:1-25, 25:1-11, 68:8-20.

[28] Martin Dep. at 81:10-14.

[29] Trawick Dep. at 26:15-25, 27:1-20. He further testified that "if an inmate's life was in danger[,] [he] would call [his] supervisor" who would "call[] the paramedics." *Id.* at 60:24-25, 61:1-15. He emphasized that "[his] responsibilit[y]" was "to call [his] supervisor[.]" *Id.* at 27:13-16.

[30] GDC Standard Operating Procedures, VH31-0005, at 2, [Doc. 67-9]. This Standard Operating Procedure provides as follows: "Correctional Personnel will have the authority to decide the most appropriate choice of action in response to a medical emergency including: a. Direct call to '911' services in the event of a life-threatening emergency. (e.g., cardiac arrest, uncontrolled bleeding. b. Direct call to Medical Personnel in the event of a serious medical problem. (Chest pain, difficulty breathing, seizures, unconsciousness. c. Notification of their supervisor about inmate/probationers with medical emergencies or serious medical problems after they have contacted the medical staff." *Id.*

[31] Ward Dep. at 11.

[32] Brawner Dep. at 16.

[33] Martin Dep. at 14.

officer should call their supervisor—not 911—when responding to an inmate's life-threatening emergency; the supervisor should then call onsite medical personnel; and medical personnel should assess the inmate and determine whether to call 911.[34]

At approximately "11:00 p.m.[,]"[35] while in the control booth, Defendant Trawick "heard a loud noise[]"[36] that sounded "like someone was fighting[,]"[37] "saw an inmate standing on the [dorm's top] balcony looking[,]" and heard an inmate "say the police is looking[.]"[38] Defendant Trawick then saw an inmate "go[ing] [upstairs] with a knife[]" wearing a bloody shirt.[39] Defendant Trawick next observed Decedent with "blood on his shirt[]" approaching the dorm's door, falling, and trying to get out.[40] Defendant Trawick

---

[34] *See* Ward Dep. at 59-60; Martin Dep. at 79-81; Brawner Dep. at 61-62; *see also* Troutman Dep. at 40-42; Easley Dep. at 25-26.

[35] Trawick Decl., Ex. 1, at 1, [Doc. 65-4]; Case Report, Investigative Case Summary, dated July 6, 2020, at 103-04, [Doc. 67-5] (same). Defendant Trawick adopted Special Agent Angelica Platts's unpaginated summary of his July 3, 2020, interview with Special Agent Nathan Adkerson. *See* Trawick Decl., ¶ 3, [Doc. 65-3]; Trawick Decl., Ex. 1, [Doc. 65-4]. For ease of reference, this document will be cited as follows: Adkerson-Trawick Interview, at 103-04, [Doc. 67-5]. The interview summary provides: "When asked what time he though[t] **this occurred** he stated around 11:00 PM." *Id.* (emphasis added). It is unclear what "this" refers to. *Id.* This could reasonably refer either to the first event described—hearing the loud noise—or to the last event described—hearing Decedent say "[g]et my [p]roperty." *Id.* Moreover, the Coroner's Death Investigation Report states as follows: "It was estimated that an altercation with another inmate took place around 2300[.]" Case Report, Coroner's Death Investigation Report, at 213, [Doc. 67-5].

[36] Adkerson-Trawick Interview, at 103, [Doc. 67-5].

[37] Case Report, Investigative Case Summary, at 125 [Doc. 67-5] (hereinafter "Phillips-Trawick Interview"). On July 8, 2020, Special Agent Timothy Phillips interviewed Defendant Trawick and summarized the interview. *Id.*

[38] Adkerson-Trawick Interview, at 103, [Doc. 67-5]. In his interview with Special Agent Phillips, Defendant Trawick stated "Later that night, he seen one guy standing at the top of the stairs and another guy standing at his window so he couldn't see inside the dorm. So he started paying attention to them." Phillips-Trawick Interview, at 125, [Doc. 67-5].

[39] Adkerson-Trawick Interview, at 103, [Doc. 67-5]; Phillips-Trawick Interview, at 125, [Doc. 67-5] ("Then the dude who got stabbed came up the steps to the control booth[.]").

[40] Trawick Dep. at 69:4-7, 71-73; Adkerson-Trawick Interview, at 103, [Doc. 67-5].

"knew [Decedent] was hurt[.]"[41] He "wanted to get [Decedent] out [of the dorm] promptly and get his supervisor down there."[42] He stepped out of the control booth and ensured other inmates stepped back from the dorm's door.[43] Defendant Trawick then opened the door, let Decedent step out of the dorm, and "quickly" shut the door behind him.[44] Decedent crawled outside the dorm and sat down against the wall on the hallway floor near the dorm's exterior door.[45] Defendant Trawick felt "it was just a really panicky situation[.]"[46] He gave Decedent a bottled water and paper towels.[47]

At approximately 11:30 p.m., Defendant Lieutenant Troutman, Defendant Trawick's supervisor,[48] received a radio call from Defendant Trawick.[49] Defendant

---

[41] Trawick Dep. at 69:23-25, 70:1-3.
[42] *Id.* at 70.
[43] *Id.* at 71-72.
[44] *Id.* at 72 ("So he steps out of the door and you shut the door very quickly? . . . Yes. . . . Then what happens? . . . I instantly call for a supervisor[.]").
[45] *Id.* at 73:10-16.
[46] *Id.* at 73:20-25.
[47] *Id.* at 74-75. Defendant Trawick did not render first aid, call onsite medical personnel, or call 911. Trawick Dep. at 73-77. The Parties dispute when Defendant Trawick first observed that Decedent was injured. *See* Defs.' SMF, ¶¶ 17, 18, 22, at 3, [Doc. 65-1]; Pl.'s Resp. Defs.' SMF, ¶¶ 17, 18, 22, at 3-4, [Doc. 67-1]. At his interview with Special Agent Adkerson, on July 3, 2020, Defendant Trawick stated, "he though[t] this occurred . . . around 11:00 PM." Adkerson-Trawick Interview, at 103-04, [Doc. 67-5]. At his deposition, on August 19, 2025, Defendant Trawick testified that he "instantly call[ed] for . . . a supervisor" "on the radio as [he was] opening the [dorm's] door[;]" but he did not specify a time. Trawick Dep. at 72. Later, in his sworn declaration, dated November 19, 2025, Defendant Trawick stated as follows: "In my after-the-fact statements, I referred to observing inmate Williams' injury and calling for backup 'around 11.' I used the term "around" because this was just an approximation. I later learned that my radio call for assistance happened at 11:30 p.m. I acted immediately when I saw the inmate's injuries and there was no delay of more than a few seconds, and certainly not a thirty minute delay." Trawick Decl., ¶ 4, [Doc. 65-3].
[48] Trawick Dep. at 28:6-8.
[49] Troutman Dep. at 53:1-25 ("I responded to the building around 2330. . . . My report says 2330. . . . That's when the officer called me."); Troutman Dep., Ex. 2, Incident Report, at 3, [Doc. 65-16] ("On 7/03/2020 at approximately 2330 hours Officer Derrick Trawick . . . who was working I-Bldg. notified myself Lt. Darren Troutman via radio stating that offender Joshua [sic] Williams . . . came from downstairs in I--1 bleeding.");

Troutman learned from Defendant Trawick that an "inmate had been stabbed" and "was down[]" and that "[Defendant Trawick] got [the inmate] out[side] . . . the dorm."[50] While in his office,[51] Defendant Unit Manager Clark also received a radio call notifying him that an inmate had been assaulted.[52] Approximately three to four minutes after receiving Defendant Trawick's radio call,[53] Defendant Troutman arrived on the scene with Defendant Clark and observed that Decedent was "bleeding with a stab wound[,]" "sitting [on the floor][,]" and "waiting for help."[54] Defendant Clark saw that "[Decedent's] [white] T-shirt was entirely covered with blood."[55] Defendant Troutman called onsite medical personnel.[56]

---

[50] Troutman Dep. at 53; Trawick Dep. at 75:13-14 ("I was on the radio telling him exactly what was going on.").

[51] Troutman Dep. at 59.

[52] Clark Dep. at 17, 43-45, 94-95.

[53] Defendant Clark arrived at the scene approximately three to four minutes after receiving his radio call. *Id.* at 95.

[54] Troutman Dep. at 59. Defendant Troutman observed Decedent was "very bloody, semi- conscious, . . . slobbering at the mouth[.]" Case Report, Affidavit and Application for a Search Warrant, at 167, [Doc. 67-5] (hereinafter "Johnson's Search Warrant Affidavit"). Defendant Troutman also noticed that "[Decedent] was unable to speak" and "could barely breathe." Johnson's Search Warrant Affidavit, at 167, [Doc. 67-5].

[55] Clark Dep. at 96:10-12. Defendant Clark asked Decedent about "what happened[]" and "who did this[,]" but Decedent did not answer. *Id.* at 96:10-18. Defendant Clark testified that, "from his perspective[,]" "all stab wounds are" life threatening. *Id.* at 107:19–108:2.

[56] Troutman Dep. at 61:20-25 ("Do you recall who called medical? I'm sure I did."). The Parties dispute when Defendant Troutman called onsite medical personnel. *See* Defs.' SMF, ¶4, at 3, [Doc. 65-1]; Pl.'s Resp. Defs.' SMF, ¶27, at 5, [Doc. 67-1]. Defendant Troutman testified that he called medical "[i]n route to the building[] [at] 2331." Troutman Dep. at 61-62. Defendants Troutman and Clark neither rendered first aid nor called 911. The Parties do not dispute this fact. *See* Pl.'s Resp. Defs.' SMF, ¶85, at 22, [Doc. 67-1] ("Neither Troutman nor Clark rendered first aid to Mr. Williams. Neither Troutman nor Clark called 911 for EMS transport."); Defs.' Resp. Pl.'s SMF, ¶85, at 13, [Doc. 73-1] ("Defendants do not dispute this statement.").

At approximately 12:00 a.m., Defendant Tolentino, the onsite nurse,[57] "receive[d] a call . . . regarding" Decedent.[58] When he first arrived on the scene, he saw Decedent sitting against a wall outside the dorm with blood-soaked clothes.[59] Defendant Tolentino decided to transport Decedent to the medical unit at BSP and assess Decedent there because it was more secure, had better lighting, and held his medical equipment.[60] Upon arriving at the medical unit,[61] he rendered first aid by applying pressure wraps and administering oxygen.[62] After rendering first aid, Defendant Tolentino called 911 and then consulted with the on-call physician at approximately 12:25 a.m. [63]

Approximately 10 to 15 minutes after the 911 call, EMS paramedics arrived at BSP.[64] At 1:00 a.m., the ambulance transporting Decedent departed from BSP,[65] and it

---

[57] Tolentino Dep. at 8, 28.
[58] *Id.* at 30-31 ("I can't really recall the exact time of [receiving a call]. That's been a long time. But it's—no, it's after 11:30. I'm kind of pretty sure of that. Between 11:30 to 12:00. That's, I'm sure, but I don't know the exact time."); *id.* at 42 ("It was past 11:30 when you were called? . . . Yes."); Urgent/Emergent Encounter Log, [Doc. 67-8] (listing "0000" in the "Time Notified" column and "7/3/20" in the "Date" column corresponding to Decedent's row).
[59] Tolentino Dep. at 32. Although he noticed that Decedent was bleeding, he could not locate "where the blood [was] coming from." *Id.* at 32. He understood that Decedent's stab wounds were life-threatening, but he did not immediately call 911 for EMS transport because he did not have a telephone with him on the scene. *Id.* at 39-40.
[60] *Id.* at 33.
[61] An officer helped him carry Decedent onto his medical cart, and he arrived with Decedent at the medical unit approximately five to six minutes later. *Id.* at 33-35.
[62] *Id.* at 35-38.
[63] *Id.* at 41-42, 56; Urgent/Emergent Encounter Log, [Doc. 67-8] (listing "0010" in the "Time EMS Notified" column and "7/3/20" in the "Date" column corresponding to Decedent's row); *see also* Pl.'s Resp. Defs.' SMF, ¶34-36, at 6, [Doc. 67-1] (explaining Nurse Tolentino called 911 before he "called the on-call Doctor at 12:25 a.m."). At approximately 12:05 a.m., while in the medical unit, Defendant Tolentino wrote his first progress note stating that Decedent had sustained "stab wounds[.]" Tolentino Dep. at 31-32, 55-56.
[64] Troutman Dep. at 69.
[65] *Id.*; Troutman Dep., Ex. 2, Incident Report, at 3 [Doc. 65-16].

arrived at Navicent Health in Milledgeville, Georgia, at approximately 1:14 a.m.[66] After providing emergency care, the Milledgeville hospital staff transferred Decedent to Navicent Health in Macon, Georgia, for further treatment.[67] Decedent was responsive when his ambulance departed from the Milledgeville hospital at 2:27 a.m.[68] Approximately 30 minutes later, Decedent arrived at the Macon hospital where he received additional treatment.[69] At 3:30 a.m., Decedent was pronounced deceased.[70] The Coroner reported that Decedent "was found with multiple sharp force injuries assumed to be stab wounds from a 'shiv'" and that he sustained "three wounds to the right shoulder and one to the occipital area."[71] GDC Special Agent Ashley Johnson stated that she inspected Decedent's body on July 3, 2020, and observed "[two] puncture wounds on his back right shoulder area[] and [one] puncture wound on the upper back of his right arm which [a nurse] reported had nicked an artery and caused him to bleed internally."[72]

---

[66] Case Report, Investigative Case Summary, at 22, [Doc. 67-5].

[67] *Id.*; Troutman Dep., Ex. 2, Incident Report, at 3 [Doc. 65-16]; GDC Incident Report, at 2 [Doc. 46-8]; Trawick Dep. at 94-97.

[68] Troutman Dep., Ex. 2, Incident Report, at 3 [Doc. 65-16]; Case Report, Investigative Case Summary, at 22, [Doc. 67-5]. Plaintiff states the ambulance left the Milledgeville hospital at 2:57 a.m. See Pl.'s Resp. Defs.' SMF, ¶114-115, at 25, [Doc. 67-1]. But no record evidence supports this time. The GDC Incident Report states as follows: "At 0157 hours, Offender Williams was transported by ambulance to Navicent Health Macon for treatment due to multiple puncture wounds to his left shoulder. He was alert and conscious at the time of departure." GDC Incident Report, at 2, [Doc. 46-8]. But all other record evidence indicates the ambulance departed at 2:27 a.m. Troutman Dep., Ex. 2, Incident Report, at 3 [Doc. 65-16]; Case Report, Investigative Case Summary, at 22, [Doc. 67-5].

[69] Trawick Dep. at 94-97; Case Report, Investigative Case Summary, at 22, [Doc. 67-5]; Johnson's Search Warrant Affidavit, at 166-67, [Doc. 67-5].

[70] Troutman Dep., Ex. 2, Incident Report, at 3, [Doc. 65-16]; GDC Incident Report, at 2 [Doc. 46-8]; Case Report, Coroner's Death Investigation Report, at 213, [Doc. 67-5].

[71] Case Report, Coroner's Death Investigation Report, at 213, [Doc. 67-5].

[72] Johnson's Search Warrant Affidavit, at 166-67, [Doc. 67-5].

As administratrix of her son's estate and as next friend of his minor daughter, Plaintiff sued Defendants Ward, Brawner, Berry, Martin, Easley, Clark, Troutman, Trawick, Thurman, Jackson, and Tolentino in their official and individual capacities under Section 1983 for wrongful death and survival damages.[73]

First, Plaintiff asserts deliberate indifference to serious medical needs claims. She alleges that between approximately 11:00 p.m. on July 2 and 1:00 a.m. on July 3, Defendants Clark, Troutman, Trawick, Thurman, Jackson, and Tolentino acted with deliberate indifference to Decedent's serious medical needs and caused his death by delaying (or denying) adequate emergency care because they failed to immediately call 911 for EMS transport upon learning of Decedent's life-threatening, stab wounds.[74] Also, she contends that Defendants Ward, Brawner, and Martin (the "Supervisor Defendants") are liable as supervisors for Defendants Clark, Troutman, Trawick, and Tolentino's (the "Subordinate Defendants'") deliberate indifference to Decedent's serious medical needs because they enforced an unwritten practice or custom preventing corrections officers

[73] Second Am. Compl., Doc. 50. The Second Amended Complaint has two counts. *Id.* "Count One" is blank. *Id.* at 27. The First Count is misnumbered "Count II[,]" and the Second Count is misnumbered "Count III[.]" *Id.* at 27, 30. To avoid confusion, the Court refers to each count based on its order.

[74] Doc. 50 ¶¶ 184-187. Plaintiff gave the First Count the following heading: "Deliberate Indifference to Serious Medical Need, U.S. Const. Amends. VIII and XIV and 42[] U.S.C. § 1983 (Clark, Troutman, Trawick, Thurman, Jackson and Tolentino)." *Id.* at 27.

from immediately calling 911 when first responding to an inmate's life-threatening medical emergency.[75]

Second, Plaintiff asserts failure-to-protect claims. She alleges that the Supervisor Defendants and Defendant Easley acted with deliberate indifference to a substantial risk of serious harm and caused Decedent's death by: (1) failing to train prison staff to conduct routine cell inspections of violent inmates; (2) failing to supervise those inspections; and (3) housing gang-affiliated and/or violent inmates with Decedent.[76] In her Response, Plaintiff also argues that Defendant Trawick acted with deliberate indifference to a substantial risk of serious harm by (1) failing to refer Decedent for protective segregation and (2) failing to perform three shakedowns of dorm areas during his shift.[77]

Defendants now move for summary judgment on all claims.[78] They argue that Plaintiff abandoned all her failure-to-protect claims by omitting them from her operative Second Amended Complaint,[79] and they contend Plaintiff cannot show the causation

---

[75] *See* Pl.'s Br. Resp. Defs.' Mot. Summ. J., [Doc. 67-2]. Plaintiff does not allege this claim in her operative Second Amended Complaint. *See* Doc. 50. Plaintiff gave the Second Count the following heading: "Supervisory Liability for Deliberate Indifference to a **Serious Medical Need**, U.S. Const. Amends. VIII and XIV and 42 U.S.C. § 1983 (Defendants Ward, Brawner, Martin and Easley)." *Id.* at 30 (emphasis added). But the Second Count asserts only failure-to-protect claims against Defendants Ward, Brawner, Martin and Easley because she alleges they acted with deliberate indifference to a substantial risk of serious harm—not a serious medical need. *Id.* ¶¶ 189-200. Thus, the phrase "a serious medical need" does not describe that count's claims.

[76] Doc. 50 ¶¶ 189-200.

[77] *See* Pl.'s Br. Resp. Defs.' Mot. Summ. J., [Doc. 67-2]. Plaintiff does not assert these failure-to-protect claims against Defendant Trawick in her operative complaint. *See* Doc. 50.

[78] Doc. 65.

[79] Doc. 65-2.

element of her deliberate indifference to serious medical needs claims because she lacks necessary medical expert testimony.[80]

## DISCUSSION

First, the Court addresses Plaintiff's official-capacity claims and several Defendants which she consents to dismiss. Second, the Court addresses Plaintiff's abandonment of her remaining failure-to-protect claims. Lastly, the Court addresses Plaintiff's failure to present expert medical testimony on causation, which is fatal to her remaining deliberate indifference to serious medical needs claims.

### I. Plaintiff Consents to Dismissing all Official-Capacity Claims and Several Defendants

In her Response to Defendant's Motion for Summary Judgment, Plaintiff consents to dismissing her official-capacity claims and all her claims against Defendants Berry, Easley, Thurman, and Jackson.[81] Thus, the Court **GRANTS** summary judgment to all Defendants on Plaintiff's official-capacity claims and to Berry, Easley, Thurman, and Jackson on all claims against them.

### II. Plaintiff Abandoned her Failure-to-Protect Claims

Defendants argue Plaintiff abandoned her failure-to-protect claims against Defendant Trawick and the Supervisor Defendants by omitting those claims from her

[80] *Id.* Defendants also argue that they are entitled to qualified immunity on all claims. *Id.*
[81] Doc. 67-2 at 4-5; Doc. 67 at 2.

operative Second Amended Complaint.[82] Plaintiff did not respond to that argument,[83] so the Court deems it unopposed and agrees Plaintiff abandoned these claims.[84]

Although Plaintiff asserted failure-to-protect claims in her First Amended Complaint,[85] she did not assert a failure-to-protect claim against Defendant Trawick in her operative Second Amended Complaint.[86] "An amended complaint supersedes the initial complaint and becomes the operative pleading[.]"[87] Thus, a plaintiff abandons any claim omitted from her amended complaint,[88] and she cannot amend her complaint

---

[82] *See* Doc. 65-2 at 18.

[83] *See id.* ("Plaintiff's latest and operative complaint only includes the two medical needs claims and omits the failure to protect claim that had been asserted in prior complaints[.]"); Doc. 67-2 (failing to address Defendants' abandonment argument); Doc. 73 at 9 (noting Defendants' abandonment argument was "ignored by Plaintiff in her response").

[84] *Jones v. Bank of Am.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("A party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed. Also, when a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.") (citations omitted) (cleaned up).

[85] Doc. 22 at 31-33. In her First Amended Complaint, Plaintiff asserted failure-to-protect claims against multiple fictitious John Doe subordinate correctional employees/officers. *Id.*

[86] Fed. R. Civ. P. 8(a)(2) requires "a short plain statement of the claim showing that the pleader is entitled to relief[.]" And that statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up) (citation omitted); *see also Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015) ("The unifying characteristic of all types of shotgun pleadings is that they fail . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.") (citations omitted). And Fed. R. Civ. P. 10(b) requires pleaders "to separate[e] into a different count each cause of action or claim for relief" and to "specify[] which of [multiple] defendants [each] claim is brought against." *Weiland*, 792 F.3d at 1323 (citations omitted). The Second Amended Complaint's First Count asserts deliberate indifference to serious medical needs claims—not failure-to-protect claims. *See* Doc. 50 ¶¶ 184-187. And its Second Count—which asserts failure-to-protect claims only against the Supervisor Defendants—does not give Defendant Trawick fair notice that Plaintiff asserted an independent failure-to-protect claim against him. *Id.* ¶¶ 189-200.

[87] *Krinsk v. SunTrust Banks, Inc.*, 654 F.3d 1194, 1202 (11th Cir. 2011) (quoting *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1219 (11th Cir. 2007)).

[88] *Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007) (quoting *Dresdner Bank AG, Dresdner Bank AG in Hamburg v. M/V OLYMPIA VOYAGER*, 463 F.3d 1210, 1215 (11th Cir. 2006)).

through arguments made in her brief opposing summary judgment.[89] Because Plaintiff abandoned her failure-to-protect claims against Defendant Trawick by omitting them from her amended complaint, the Court **GRANTS** summary judgment to Defendant Trawick on those claims.

Although Plaintiff asserted failure-to-protect claims against the Supervisor Defendants in her Second Amended Complaint,[90] she failed to address Defendants' arguments for dismissal in her Response to Defendant's Motion for Summary Judgment.[91] At the summary-judgment stage, a plaintiff abandons her claim if she does not respond to or otherwise address a defendant's motion regarding that claim.[92] Thus, the Court **GRANTS** summary judgment to Defendants Ward, Brawner, and Martin on Plaintiff's failure-to-protect claims against them.

---

[89] *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 859 (11th Cir. 2020) (quoting *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013)) (cleaned up).

[90] Doc. 50 ¶¶ 189-200.

[91] Doc. 65-2; Doc. 67-2.

[92] *Jones*, 564 F. App'x at 434 ("A party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed. Also, when a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.") (citations omitted) (cleaned up); *Resolution Trust Corp. v Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc) ("In opposing a motion for summary judgment, 'a party may not rely on his pleadings to avoid judgment against him[]'" because "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (quoting *Ryan v. Int'l Union of Operating Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir.1986)) (citing *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994)).

**<u>III. Plaintiff's Lack of Expert Medical Causation Testimony is Fatal to her Deliberate Indifference to Serious Medical Needs Claims</u>**

Defendants argue that Plaintiff cannot establish the causation element of her deliberate indifference to serious medical needs claims because she failed to present medical expert testimony necessary to establish that any delay in calling 911 caused Decedent's death.[93] Plaintiff did not respond to that argument,[94] so the Court deems it unopposed.[95] The Court agrees with Defendants' unopposed argument.

To establish a deliberate indifference to serious medical needs claim,[96] a plaintiff must show that (1) the plaintiff suffered an "objectively, sufficiently serious" "deprivation[]" and that (2) "the defendant acted with subjective recklessness as used in the criminal law."[97] The objective element "turns on whether the plaintiff experienced an 'objectively serious medical need,'"[98] and the subjective element "turns on whether the 'prison official acted with an attitude of "deliberate indifference" to [that] serious medical

---

[93] Doc. 65-2 at 16.

[94] Doc. 67-2; Defs.' Reply, Doc. 73.

[95] *Jones*, 564 F. App'x at 434 ("A party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed. Also, when a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.") (citations omitted) (cleaned up).

[96] "'[D]eliberate indifference to [the] serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain' in violation of the Eighth Amendment." *Stalley v. Cumbie*, 124 F.4th 1273, 1283 (11th Cir. 2024) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)) (cleaned up). And "[a]n official may act with deliberate indifference by 'delaying the treatment of serious medical needs.'" *Sneed v. Acosta-Martinez*, No. 25-11385, 2026 WL 1021490, at *1 (11th Cir. Apr. 15, 2026) (quoting *Ireland v. Prummell*, 53 F.4th 1274, 1288 (11th Cir. 2022)).

[97] *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc) (citations and internal quotation marks omitted); *Wingo v. WellStar Health Sys., Inc.*, 160 F.4th 1184, 1190 (11th Cir. 2025) (same) (citing *Wade*, 106 F.4th at 1262).

[98] *Stalley*, 124 F.4th at 1283 (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)).

need.'"[99] As with any § 1983 claim, a plaintiff must also demonstrate causation by "establish[ing] that [the prison official's] deliberate indifference caused [their] injury."[100] Thus, "a plaintiff 'must satisfy both an objective and a subjective [element],' and must establish a 'necessary causal link' between the challenged conduct and their injuries[.]"[101]

To prove causation, a plaintiff must "show that the [officer's deliberate indifference] was [both] a cause-in-fact of the injuries and damages claimed[]" and their proximate cause.[102] "To establish cause-in-fact, the plaintiff must show that except for the constitutional tort, such injuries and damages would not have occurred."[103] Simply put, "[a]s with any tort claim, [the plaintiff] must show that [their] injury was caused by the defendant's wrongful conduct."[104] As a result, when a prisoner contends that a delay in

---

[99] *Id.* (quoting *Farrow*, 320 F.3d at 1243).
[100] *Donald v. Norris*, 131 F.4th 1255, 1265 (11th Cir. 2025) (citing *Hale v. Tallapoosa County*, 50 F.3d 1579, 1584 (11th Cir. 1995)); *see also Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) ("In addition, section 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation."); *Wingo*, 160 F.4th at 1192 ("[D]eliberate indifference claims . . . require that a plaintiff demonstrate causation.") (citing *Marbury v. Warden I*, 936 F.3d 1227, 1233 (11th Cir. 2019)); *see also Marbury v. Warden III*, 180 F.4th 1349, 1356 (11th Cir. 2026) ("To establish a § 1983 claim for deliberate indifference, a plaintiff must show (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and **(3) causation**.") (quoting *Marbury I*, 936 F.3d at 1233) (cleaned up) (emphasis added).
[101] *Stalley*, 124 F.4th at 1283 (first quoting *Farrow*, 320 F.3d at 1243, then quoting *Marbury I*, 936 F.3d at 1233).
[102] *Jackson v. Sauls*, 206 F.3d 1156, 1168 n.16 (11th Cir. 2000) (citing W. Page Keeton, et al., Prosser and Keeton on the Law of Torts, §§ 41–42, at 263–80 (5th ed.1984)); *see also Buckman v. Halsey*, No. 20-13596, 2021 WL 4127067, at *3 (11th Cir. Sept. 10, 2021) ("Common law tort principles of damages and causation apply in the § 1983 context.") (citing *Jackson*, 206 F.3d at 1168).
[103] *Jackson*, 206 F.3d at 1168 n.16; *see also Donald*, 131 F.4th at 1265 (quoting *Jackson*, 206 F.3d at 1168 n.16) (same).
[104] *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) *overruled on other grounds by Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc), (citing *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995)).

treatment caused his injuries, he "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment."[105]

"When the issue of causation presents a medical question beyond a layperson's ordinary experience, expert testimony is necessary" for a deliberate indifference claim.[106] The Eleventh Circuit recently illustrated this in *Wingo v. WellStar Health System, Inc*.[107] In that wrongful-death action,[108] the plaintiff alleged that a sheriff's deputy, who was responsible for observing the decedent's cell, acted with deliberate indifference to his serious medical needs and caused his death by failing to call 911 "for emergency medical care between 7:45 and 8:45 a.m."[109] The *Wingo* Court held that the deputy was entitled to summary judgment because the issue of whether the deputy's hour-long inaction caused the decedent's death was "a medical question beyond a layperson's ordinary experience[,]" and the plaintiff's medical causation expert admitted he could not opine

[105] *King v. Lawson*, No. 21-14492, 2024 WL 3355179, at *3 (11th Cir. July 10, 2024) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188, 1190 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002)); *see also Owen v. Corizon Health Inc.*, 703 F. App'x 844, 847 (11th Cir. 2017) (per curiam) (same). Also, in determining "whether any particular delay is unconstitutional, the applicable court must consider the reason for the delay and the nature of the medical need." *Sneed v. Acosta-Martinez*, No. 25-11385, 2026 WL 1021490, at *1 (11th Cir. Apr. 15, 2026) (quoting *Harris v. Coweta Cnty.*, 21 F.3d 388, 394 (11th Cir. 1994)).
[106] *Wingo*, 160 F.4th at 1192 (citations omitted).
[107] *Id.* There, the decedent was a pretrial detainee protected by the Fourteenth Amendment—not the Eighth Amendment. *Id.* at 1187. But the deliberate indifference standard is the same. *Id.* at 1190-91.
[108] *Id.* at 1189.
[109] *Id.* at 1190; *see also Wingo v. Harris*, No. 1:20-CV-03662-VMC, 2024 WL 1478030, at *14 (N.D. Ga. Feb. 26, 2024), *aff'd sub nom. Wingo v. WellStar Health Sys., Inc.*, 160 F.4th 1184 (11th Cir. 2025).

on whether the decedent would have survived had the deputy called for emergency care at 7:45 a.m.[110]

Like in *Wingo*, expert medical testimony is necessary to prove causation here. For each Subordinate Defendant, Plaintiff must show that their alleged wrongful conduct—their failure to immediately call 911 after learning of Decedent's stab wounds—delayed Decedent's emergency medical care for a specific time and thereby caused his death. Viewing the facts in the light most favorable to Plaintiff, Defendant Trawick learned of Decedent's stab wounds at approximately 11:00 p.m. Defendants Troutman and Clark learned of Decedent's stab wounds at approximately 11:30 p.m. Defendant Tolentino learned of Decedent's stab wounds at approximately 12:00 a.m. and called 911 before approximately 12:25 a.m. Thus, construing the facts in the light most favorable to Plaintiff, Defendant Trawick's inaction caused a treatment delay of approximately 85 minutes, and Defendants Troutman and Clark's inaction caused a treatment delay of approximately 55 minutes. Defendant Tolentino's inaction caused a treatment delay of approximately 25 minutes.

This "medical causation issue"—whether each Subordinate Defendant's alleged delayed action was a cause-in-fact of Decedent's death—"presents a technical and

[110] *Wingo*, 160 F.4th at 1192; *see also Wingster v. Head*, 318 F. App'x 809 (11th Cir. 2009) (affirming summary judgment to defendants on excessive force claims because the plaintiff failed to present necessary medical expert testimony showing the defendants' alleged beatings caused the decedent to suffer an aneurysm and die two days later).

scientific issue that requires the specialized knowledge of an expert medical witness."[111] The question of whether Decedent would have survived but for each Subordinate Defendant's failure to immediately call 911 for outside emergency care requires technical and scientific medical knowledge beyond the ordinary layperson's experience. In other words, a layperson could not determine whether Decedent would have survived if each Subordinate Defendant had called for EMS any amount of time sooner than when EMS was eventually called. Answering this "medical question" concerning "the detrimental effect of a delay in treatment" requires "verifying medical evidence in the record" and expert medical knowledge of the progression and emergency treatment of multiple stab wounds.[112] Plaintiff presents neither.

Because Plaintiff fails to present necessary expert testimony on medical causation, a reasonable jury could not find any Subordinate Defendant's inaction was a cause-in-fact of Decedent's death. Thus, Plaintiff does not present sufficient evidence of causation to survive summary judgment. Accordingly, the Court **GRANTS** Defendants Trawick, Troutman, Clark, and Tolentino summary judgment on Plaintiff's deliberate indifference to serious medical needs claims against them.

Similarly, the Supervisor Defendants are entitled to summary judgment on Plaintiff's deliberate indifference to serious medical needs claims against them. Plaintiff

---

[111] *Wingster*, 318 F. App'x at 815.

[112] *Wingo*, 160 F.4th at 1192; *King*, 2024 WL 3355179, at *3 (quoting *Hill*, 40 F.3d at 1188, 1190).

argues that the Supervisor Defendants are liable as supervisors because they enforced a custom preventing corrections officers from directly calling 911. She contends that this custom caused the Subordinate Defendants to delay calling 911 which delayed Decedent's emergency medical care and thereby caused his death.

To meet the Eleventh Circuit's "extremely rigorous" "standard for supervisory liability[,]"[113] "a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation."[114] Because Plaintiff fails to show the Subordinate Defendant's alleged wrongful conduct caused Decedent's death, Plaintiff cannot show their supervisors' implementation of the custom they followed—the Supervisor Defendant's alleged wrongful conduct—caused Decedent's death. Thus, Plaintiff does not present sufficient evidence of causation to survive summary judgment. Accordingly, the Court **GRANTS** Defendants Ward, Brawner, and Martin summary judgment on Plaintiff's deliberate indifference to serious medical needs claims against them.

---

[113] *Goodman v. Kimbrough*, 718 F.3d 1325, 1335 (11th Cir. 2013) (describing the "standard for supervisory liability" as "extremely rigorous") (citation omitted); *see also Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) ("[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability.") (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)).

[114] *Keith v. DeKalb County*, 749 F.3d 1034, 1047–48 (11th Cir. 2014); *see also Roy v. Ivy*, 53 F.4th 1338, 1352 (11th Cir. 2022) (same). "[T]he causal connection may be established when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights[.]" *Keith*, 749 F.3d at 1048 (quoting *Cottone*, 326 F.3d at 1360).

## CONCLUSION

For the reasons explained above, all Defendants are entitled to summary judgment on all claims. Thus, the Defendants' Motion [Doc. 65] is **GRANTED**.

**SO ORDERED,** this 30th day of September, 2026.

s/ C. Ashley Royal
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT